CIVIL ACTION NO. 2010-74 (WOB)

COLONY NATIONAL INS.
CO.                                              PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

SORENSON MEDICAL,
INC., ET AL.                                     DEFENDANTS

This is a declaratory judgment action in which the plaintiff insurer seeks to rescind two policies of excess liability insurance on the grounds of alleged misrepresentations by defendants in the applications. Plaintiff also asserts several alternative coverage defenses. Defendants counterclaim for breach of the duty of good faith and fair dealing.

This matter is now before the Court on defendants' motion for summary judgment (Doc. 27) and plaintiff's motions for partial summary judgment (Docs. 28, 29).

Having previously heard oral argument on these motions and received supplemental briefs (Docs. 62, 63, 65, 74, 75), the Court now issues the following Memorandum Opinion and Order.

**A.    The Sorenson Companies**

Sorenson Medical, Inc. ("SMI") manufactured pain pumps which were used, as relevant here, in the shoulders of patients following surgery.  SMI ceased operations on December 31, 2007, when Sorenson Development, Inc. ("SDI") foreclosed on a promissory note that it held which was secured by the assets of SMI.  Around this time, SMI changed its name to SMI Liquidating, Inc.  (Haight Depo. 39)  The assets of SMI Liquidating, Inc. were then transferred to SDI pursuant to its foreclosure on the SMI note.  (*Id.*)

In January 2008, SDI created Sorenson Medical Products, Inc. ("SMPI") as a wholly-owned subsidiary.  SMPI then began manufacturing and marketing the same pain pumps previously made by SMI, hiring all but two of SMI's employees to perform the same jobs they had performed for SMI.

**B.    Application for the "Year One" Policy**

SMI obtained a primary $10 million layer of coverage from Columbia Casualty Company ("CNA") for the period July 1, 2007 to July 1, 2008.  In early May 2007, SMI completed an application for a $10 million excess liability policy from Colony National Insurance Company ("Colony") for the

same period.  This application, which was created by CNA, was signed by SMI's Controller/Vice-President of Finance, Kenneth Youngquist ("Youngquist").

Question 25 on the Year One application states: "Do you contract out product development, manufacturing, sales, distribution services?"  (Exh. A to Def. MSJ)  Youngquist answered: "We will be outsourcing mfg. in the coming months."  As will be discussed in more detail below, Colony claims that this response was a material misrepresentation because SMI did not disclose that it also contracted out sales and distribution services.  However, in Question 29, which asked for the names of the applicant's largest clients, Youngquist listed Arrow, a medical device wholesale distributor.

On June 26, 2007, Colony's underwriter, Hue Doan ("Doan"), issued a quote for the excess policy, and coverage was bound on June 29, 2007.

Importantly, this policy covers only claims which are "first made and reported in writing" during the policy period.

B. <u>**Kentucky Pain Pump Cases**</u>

On February 14, 2008, the first of numerous product liability cases involving the pain pumps manufactured by SMI was filed in this court.  *Ritchie, et al. v. SMI*

*Liquidating, Inc.*, Cov. Civil Action No. 08-19. SMPI gave written notice of the *Ritchie* action to Colony on February 26, 2008. (Exh. 9 to Colony's Omnibus Statement of Undisputed Facts ("SOF")).

Two days later, on February 28, 2008, the *Ritchie* complaint was amended to add another plaintiff, Spencer Morgan. (Exh. 10 to SOF).

On April 8, 2008, the *Ritchie* complaint was again amended, adding Cassie Voges as a plaintiff. (Exh. 11 to SOF).

On May 28, 2008, another lawsuit was filed by Chelsea Zink. *Zink v. SMI Liquidating, Inc.*, Cov. Civil Action No. 08-95. (Exh. 12 to SOF). Finally, on May 30, 2008, another action was filed by plaintiffs Amber Cornett and Jeffrey Wera. *Cornett v. SMI Liquidating, Inc.*, Cov. Civil Action No. 08-100. (Exh. 13 to SOF).

Defendants aver that they did not receive notice of the *Zink* action until July 15, 2008, after the Year One policy had expired. (Doc. 66-1 at 11, Defendants' Responses to Plaintiff's Interrogatories). Defendants gave written notice to Colony of the *Zink* claim on August 6, 2008. (Exh. 14 to SOF).

The notes of Colony's claims examiner, John Reitwiesner ("Reitwiesner"), reflect that was aware of the

*Cornett* and *Wera* claims as of August 20, 2008, by way of a
phone call from CNA. (Exh. AA to Def. MSJ). Colony posits
that the *Morgan* and *Voges* claims were also discussed during
that call. (Doc. 75 at 1) At any rate, defendants concede
that they cannot show that Colony had actual notice of
these claims any earlier than August 2008. (Doc. 67 at
44).

### C.   Application for the "Year Two" Policy

On May 8, 2008, Scott Parkinson of SMPI signed an
application for a second excess insurance policy from
Colony for the period July 1, 2008 to July 1, 2009. (Exh.
G to Def. MSJ). This application form was also created by
CNA. In response to the same Question 25 about whether
SMPI contracted out, Parkinson responded: "Yes,
manufacturing." Parkinson did not state that SMPI
contracted out sales functions, which Colony also claims
was a material misrepresentation. In Question 29, however,
Parkinson listed several medical device wholesale
distributors as clients. Parkinson also attached documents
in response to a separate question that reference SMPI's
"distributors," including a "Manufacturer's Agreement"
which defendants say explicitly shows the involvement of
distributors in the sale of SMPI pain pumps.

On the Year Two application, Parkinson listed the applicant's name as "Sorenson Medical Products, Inc." and stated that it had been in business for "9 years continuous operations." The address listed was the same as had been listed for SMI in the Year One application. Question 11 of the application asks, "Have you operated under another name?" Parkinson wrote: "Yes; Sorenson Medical, Inc."

In response to questions regarding prior regulatory actions, Parkinson included information about agency investigations and warnings that occurred prior to January 2008, under the auspices of SMI.

Colony's underwriter, Doan, received the Year Two application, again accompanied by a loss history form completed by the broker, on June 16, 2008. Eleven days prior to that, Colony had received an email from its wholesale broker asking that SMPI be added as an "additional insured" to the Year One policy. The email was in the underwriting file at the time the Year Two application was received, but Doan testified that he never looked at it.

In the meantime, on June 17, 2008, Doan quoted the same premium for the same $10 million in coverage, excess to an underlying policy issued for the same period by CNA.

This Year Two policy also covers only claims that are "first made and reported" within the policy period.

## C. Colony Begins Reviewing Possible Coverage Issues

After Reitwiesner was contacted by CNA in August 2008, he began reviewing the pain pump cases more closely, and he scheduled a conference call for September 22, 2008, to discuss the cases with defendants' counsel. (Exh. A to Doc. 34).

On September 30, 2008, Reitwiesner wrote a lengthy memo summarizing the pain pump cases, noting:

> <u>Sorenson manufactured the pump and then sold it to various retailers, who in turn, sold the pumps to various physicians for use.</u> ***The training of each salesperson on pump use/application, is done by their respective employers, not by the insured.*** In the 9 cases pending in Kentucky, we have narrowed the sale of the Sorenson pump through one retailer and one salesperson. To date we have not uncovered any material that the retailer used in training its salesperson which would indicate that the pump could be used intra-articularly. Regardless, a credible argument can be made that Sorenson had a duty to train the salesmen on the use of the pump rather than leaving it to a third party to do the training. What may also complicate this issue further, is that the salesman in question was a boat salesman prior to becoming a seller of medical devices. <u>This raises the further question as to how much "vetting" the insured did on its contracted retailers to ensure that those selling their product are knowledgeable in its proper use.</u>

(Exh. Q to Def. MSJ) (underlining added).

Doan was among the recipients of this report. He testified that he "vaguely" remembered receiving it,

printing it out, skimming through it, and placing it in the file.  (Doan Depo. 155).

On October 9, 2008, Reitwiesner emailed Doan to ask if the SMI policy had been renewed for 2008-09, and Doan stated that it had.  (Exh. B to Doc. 34).  Reitwiesner asked: "Who can I contact to get a copy of the policy?  **I checked the Underwriting file and it is not in there.**" (*Id.*) (emphasis added).  This latter statement is significant because it is undisputed that the policy applications were part of the underwriting file. (Reitwiesner Depo. 43-44, 51).

On October 10, 2008, Reitwiesner wrote to another person in Doan's office:  "Can I get a copy of the 08-09 policy for [Sorenson Medical]?  **We need to get a coverage analysis done asap!"**  (Exh. P to Def. MSJ) (emphasis added).  Reitwiesner received a copy of the Year Two policy the same day.  (Exh. C to Doc. 34).

On November 5, 2008, Reitwiesner emailed a copy of the Year Two policy to outside coverage counsel, Mary Stafford ("Stafford"), at the firm of Clausen Miller.  (Exh. D to Doc. 34).  Reitwiesner testified that he gave Stafford the policies and the pain pump complaints and asked her to help him "identify possible coverage issues that may come up based on the information we had."  (Reitwiesner Depo. 50).

He also testified that the underwriting file was available to Stafford and that he was "pretty sure" she reviewed it before she gave a coverage opinion. (*Id.* at 51).

On November 17, 2008, Colony, under Reitwiesner's signature, issued a reservation of rights letter to defendants. (Exh. R to Def. MSJ). The letter stated, among other things, that defendants' request for coverage was premature because the underlying coverage through CNA had not yet been exhausted. The letter also recited other provisions of the Colony policy, including the "claims first made and reported" requirement. Further, the letter stated:

> Some of the underlying claims were filed against SMI Liquidating, Inc. f/k/a Sorenson, Medical, Inc. Please explain the relationship between SMI Liquidating, Inc. and Sorenson Medical, Inc. Argonaut reserves the right to deny coverage to any entity that does not qualify as an insured under the Argonaut policies.

(*Id.* at 10)

Despite these events, on June 30, 2009, Colony agreed to extend the period of the Year Two policy for an additional month for a fee of $5,000. (Exh. G to Doc. 34).

On June 29, 2009, a note by Colony Claims Manager Chris Lucci ("Lucci") stated that Reitwiesner was "in the process of preparing a status update regarding the litigation for the appropriate reinsurers. Our coverage

counsel is monitoring very closely for developments."
(Exh. S to Def. MSJ).

On August 5, 2009, Reitwiesner forwarded to Stafford a copy of an endorsement to the CNA policy which added certain Sorenson entities as additional insureds, stating "Take a look and let me know your thoughts." (Exh. T to Def. MSJ).

Then, despite these expressed concerns, on August 28, 2009, Colony sold SMPI a three-year "Extended Reporting Period" ("ERP") endorsement to the Year Two policy for $135,720.[1] (Exhs. H, I to Doc. 34).

On September 23, 2009, Lucci wrote an email to Doan and Doan's superior Mimi Fiske, copying Reitwiesner, stating that the number of pain pump suits had increased to 26; mediation was set for the Kentucky cases in November; it was his understanding that CNA would be "posting half of their limit shortly;" and he wanted to schedule a conference call for October 6. (Exh. E to Doc. 34).

### D. Settlement of Kentucky Pain Pump Cases

In early November 2009, a multiple-day mediation of the Kentucky pain pump cases was held. Several of the higher-value claims were settled and paid under the primary

---

[1] Under the ERP, claims made after expiration of the Year Two policy but during the ERP are treated as having been made under the Year Two policy.

CNA policy, including the claim by Amber Cornett.

Reitwiesner attended the mediation on behalf of Colony.

Sorenson's representative at the mediation, LeVoy
Haight, testified that Reitwiesner was very involved in the
mediation discussions, and that he (Haight) was left with
the impression that money would still be available after
these settlements to cover future claims. (Haight Depo.
61-64). Haight could not remember exactly what Reitwiesner
said, however, or whether he made any specific statements
as to what coverage would be available under which
policies. (*Id.*). In fact, Haight was not even aware at
the time that there were two policies involved. (*Id.* at
65).

In early December 2009, defendants' counsel made a
presentation via conference call to the insurers. The
record does not detail this call, presumably because the
communications are covered by the attorney-client
privilege. However, on December 10, 2009, Fiske, Doan's
boss, emailed Doan: "the report date of the claim is
2/26/08, yet we renewed 7/1/08 . . . did we know about the
claim?" (Exh. 29 to SOF). Doan responded:

> We were aware of the claim, but had very little info
> and the loss information we had at the time was
> indicative of medical malpractice by the orthopedic
> surgeon.

(*Id.*).

Finally, on December 11, 2009, Doan emailed another underwriter stating:

> Please take a look at my email to Mimi below and I
> would like to call you next week to discuss.  After
> the conference call with the attorney, retained by
> CNA, I feel that the answers given on the signed
> application from their submission contradict the
> findings of this attorney.  I would have definitely
> reviewed and underwritten this account with a
> completely different perspective if the answers from
> the supplemental application were based on the recent
> findings.

(*Id.*)

On February 23, 2010, shortly before a scheduled March settlement conference that was intended to resolve the remaining Kentucky pain pump cases, Colony sent two reservation of rights letters to defendants' counsel raising, for the first time, the material misrepresentations alleged in this case.  (Exhs. U, V to Def. MSJ).

The *Morgan*, *Voges*, and *Wera* claims were settled at the March 2010 mediation with money from CNA (apparently exhausting its policy limits), Colony, and a third carrier.

On April 1, 2010, Colony sent another reservation of rights letter to defendants' counsel identifying "gaps" in the coverage.  The letter opened as follows:

> Now that Colony National will be funding the defense
> of some (but not all) of the Sorenson entities in

connection with certain lawsuits, we write to formally
set forth the reservation of rights under which those
costs will be reimbursed.

(Exh. O to Def. MSJ).  The letter then set forth specific

issues:

> 1.   Because both the Zink and Cornett claims were
> made in the 2007-2008 policy period but not reported
> to Colony until the 2008-2009 policy period, and
> because the Colony policies are "claims first made <u>and</u>
> reported" policies, neither claim triggers a coverage
> grant.  **Consequently, the Cornett settlement payment
> also does not erode the underlying limit of the CNA
> policy for the purpose of reaching the Colony excess
> coverage.**

> 2.   Because the CNA underlying policies contain a
> "relate back" provision, CNA's position is that the
> many pain pump claims made in the 2008-2009 period
> "relate back" and fall within the coverage of the
> underlying CNA 2007-2008 policy.  However, the Colony
> policies contain no such "relate back" clause.
> Therefore, claims first made and reported in 2008-2009
> would be covered only under the 2008-2009 Colony
> policy.  However, because those claims are covered
> only under the 2007-2008 underlying coverage, they
> cannot erode the underlying coverage for purposes of
> the 2008-2009 Colony excess policy.

(*Id.*)  The letter summarized these points:

> **For practical purposes, this means that, if claims
> "relate back" under the 2008-09 CNA policy, but not
> under the 2008-09 Colony National policy, the insureds
> have a substantial gap in coverage for both years.
> Unless and until liability and defense costs – for
> claims first made in the 2007-08 or the 2008-09 policy
> period – exceed $10 million, no Colony National policy
> is triggered.**

(*Id.*) (emphasis added).

### C.    **Coverage Litigation Begins**

#### 1.    **The Instant Litigation**

Colony filed this declaratory judgment action on April 2, 2010, alleging four claims.  (Doc. 1).  The first claim seeks rescission of the Year One policy based on the alleged misrepresentations concerning SMI's contracting out of its sales and distribution activities.  (Compl. ¶¶ 51-56).  The second claim seeks rescission of the Year Two policy based on the same "contracting out" misrepresentations, as well as on misrepresentations and/or concealment of facts regarding the name change from SMI to SMPI and the foreclosure of the SMI note by SDI.  (Compl. ¶¶ 57-64).

Colony's third claim for relief, pled in the alternative, seeks a declaration that there is a "gap" in coverage under the 2008-09 policy year.  That is, because the claims made during the 2008-09 policy period "relate back" to the first policy period under the CNA policy, they do not erode the underlying limits of the Year Two Colony excess policy.  Colony thus seeks a declaration that it has no coverage or defense obligation until the underlying limit of the 2008-09 policy period is exhausted.  (Compl. ¶¶ 65-72).

The fourth claim similarly seeks a declaration that there is a "gap" in coverage created by the Cornett and Zink claims, which were not both "made and reported" in the same policy period. Further, Colony alleges, under the language of its excess policy, any excluded claims cannot exhaust the underlying coverage. Therefore, to the extent that defendants have paid money in connection with the Cornett or Zink claims, those payments are not recognized for exhaustion purposes. (Compl. ¶¶ 73-83).

Defendants filed an Answer and Counterclaim on May 14, 2010. (Doc. 11). In their Counterclaim, defendants allege that <u>all</u> pain pump claims against it were promptly reported to Colony. (*Id.* ¶¶ 8-11). Defendants assert that Colony never raised the issues of rescission or coverage gaps during the November 2009 mediation but instead waited until just before a scheduled March 2010 mediation to raise these issues. Defendants thus assert a counterclaim for breach of the duty of good faith and fair dealing.

Given this Counterclaim, Colony takes the position that coverage for all Kentucky claims – not just *Zink* and *Cornett* – are at issue in this matter. This includes the *Morgan*, *Voges*, and *Wera* claims.

## 2. Coverage Litigation in Utah

On May 14, 2010, CNA sued the Sorenson entities in the Northern District of California. (Exh. W to Def. MSJ). The suit was transferred to the District of Utah on defendants' motion. In that action, CNA seeks a declaration that any pain pump claims filed during the 2008-09 policy period "relate back" to the prior policy period, as discussed above, such that all claims fall only within the limit of liability for the 2007-08 policy period.

The Utah litigation remains pending.

### *Analysis*

The parties agree that Utah law applies in this diversity declaratory judgment action.

## A. Rescission

### 1. Standard for Rescission

Rescission of an insurance contract under Utah law is governed by § 31A-21-105 of the Utah Code, which states:

> [N]o misrepresentation or breach of an affirmative warranty affects the insurer's obligations under the policy unless: (a) the insurer relies on it and it is either material or is made with intent to deceive; or (b) the fact misrepresented or falsely warranted contributes to the loss.

Utah Code Ann. § 31A-21-105(2).

"In order to invalidate a policy because of a misrepresentation by the insured, an insurer need prove applicable only one of the above provisions." *Derbridge v. Mut. Protective Ins. Co.*, 963 P.2d 788, 790 (Utah App. 1998) (citation omitted). "However, while the insurer must show only one of these three provisions has been met, under each alternative a threshold requirement is that the applicant have made a 'misrepresentation.'" *Id.* at 791.

While the above statute does not define "misrepresentation," the court in *Derbridge* held that a misrepresentation is "something more than an innocent misstatement." *Id.* at 795. The Tenth Circuit has construed *Derbridge* as requiring "some level of bad faith before a misstatement may serve as a basis of rescission" under Utah law. *ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 494 F.3d 1238, 1244 n. 3 (10th Cir. 2007).

In *ClearOne*, the Tenth Circuit held that the required state of mind of the insured as to alleged misrepresentations is recklessness, *i.e.*, that the insured "knew or should have known" of the falsity of the statement in question. *Id.* at 1247.

Further, "a fact is material to the risk assumed by an insurance company if reasonable insurers would regard the

fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application." *Id.* at 1249-50 (citation omitted). "In other words, a material fact is one that would naturally influence the insurer's judgment in making the contract, in estimating the degree and character of the risk, or in fixing the rate of insurance." *Id.* at 1250 (citation omitted) (internal quotation marks omitted).

### 2. The Defenses of Waiver/Equitable Estoppel

An insurer's right to rescind an insurance policy may be lost through waiver or equitable estoppel.

"In order to determine whether a party has waived its right to rescind a contract, the court must find that an 'intentional relinquishment of a known right' has been made." *ClearOne*, 114 P.3d at 1161 (citation omitted). To constitute waiver, "there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it." *Id.*

Waiver of the right to rescind may be either express or "implied from action or inaction." *Id.* Nonetheless, the intent to relinquish the right "must be distinct." *Id.* Whether waiver has occurred is determined based on the "totality of the circumstances." *Id.*

An "insurer waives the right to rescind an insurance policy when that insurer has knowledge of facts that would give it the right to rescind the policy, and does not act promptly to assert or reserve the right to rescind the policy, or otherwise treats the policy as valid, such as by earning and collecting premiums." *Id.* at 1162 (citing *Farrington v. Granite State Fire Ins. Co.*, 232 P.2d 754, 758 (Utah 1951)).

"One who claims a right of rescission must act with reasonable promptness, and if after such knowledge, he does any substantial act which recognizes the contract as in force . . . such an act would usually constitute a waiver of his right to rescind." *Farrington*, 232 P.2d at 758.

In contrast to the doctrine of waiver, the doctrine of equitable estoppel may apply even in the absence of knowledge of the misrepresentation:

> (1) if the insurer has information which would have put a prudent person on notice of possible falsity and would have caused an inquiry which, if carried out with reasonable diligence, would have revealed the truth, the insurer cannot rely on the misrepresentation; and (2) if the insurer chooses to make an independent inquiry and a reasonable search would have uncovered the misrepresentation but the facts were not discovered because the investigation was cursory, the insurer cannot rely on the misrepresentation.

*ClearOne*, 494 P.3d at 1250 (citation omitted).

### B. <u>Year One Policy</u>

The parties have filed cross motions for summary judgment on Colony's claim for rescission of the Year One policy on the theory that defendants made a material misrepresentation in response to Question 25, which asks: "Do you contract our product development, manufacturing, sales, distribution services?"

The application does not define "contract out." Kenneth Youngquist, who completed the application for SMI, testified that he did not interpret "contract out" as it applies to sales to include the use of wholesale distributors to get their pain pump products to the end users, *i.e.,* doctors and hospitals. He testified that, while SMI did not have a field sales force, it had a Vice-President of Sales whose job was to sell the products to a network of wholesale distributors, and that it was the distributors whom he viewed as SMI's "customers." (Youngquist Depo. 24).

As to the term "distribution services" used in Question 25, Youngquist testified:

> Well, as I look at that question, when one talks about "distribution services," to my mind that is related to warehousing and shipment. And we had our own warehouse and shipped out of our warehouses to our distributors.

But, it – it appears to me that that has to do with the distribution of the product, not the sale of the product. We sold the product through Scott [the VP of Sales] to distributors for sales purposes. So clearly my understanding of the question didn't coincide with the insurance company's definition of the question.

(*Id.* at 25-26).

Further, in response to the question on the application about the insured's largest clients, Youngquist listed Arrow, one of its wholesale distributors. If Youngquist was intending to hide the fact that SMI used wholesale distributors, he likely would not have listed one as the company's biggest customer.

Thus, it does not appear that this court can hold as a matter of law that the answer to this question was a "misrepresentation" because the evidence raises a material dispute as to whether SMI "knew or should have known" of the falsity of the answer or, stated differently, whether there was "some level of bad faith" in its response. *See ClearOne*, 494 F.3d at 1247.

However, as discussed below, even if Colony had a right to rescind the Year One policy, it has waived that right and/or is estopped from asserting it.

C. **Year Two Policy**

The parties also move for summary judgment on Colony's claim for rescission of the Year Two policy.

Question 25 of the Year Two application also asked: "Do you contract out product development, manufacturing, sales, distribution services?" (Exh. G to Def. MSJ). Parkinson, who completed the application for SMPI, answered only: "Yes, manufacturing." In response to Question 29 which asked for the identity of the applicant's biggest customers, however, Parkinson listed several medical device wholesale distributors. Attached to the application was a Manufacturer's Agreement, which states: "SMI has entered into contracts with certain distributors and original equipment manufacturers (the "Buyers") whereby such entities have agreed to purchase and distribute the Products."

Similar to Youngquist, Parkinson testified that he viewed SMPI's wholesale distributors as the company's customers, who in turn sold the pain pumps to their customers. (Parkinson Depo. 85). He further testified that even if he had known that the distribution agreements referred to the wholesale distributors as "independent contractors," it would not have impacted how he responded to Question 25. (*Id.* at 84-85).

As with the Year One application, it thus cannot be said as a matter of law that Parkinson's answer to Question 25, viewed in the context of the undefined term "contracts

out," his testimony regarding his interpretation of the question, and the other information he provided, is a "misrepresentation" within the meaning of the Utah rescission statute.

The court is of the same opinion with respect to the alleged "name change" misrepresentations. Parkinson listed the applicant as "Sorenson Medical Products, Inc." In response to the question, "How long has the Named Insured been in business?" Parkinson stated: "9 years continuous operations." He also identified SMPI's parent corporation as Sorenson Development, Inc. and stated that SMPI had previously operated under the name "Sorenson Medical, Inc."

Parkinson testified that, given the chain of events regarding SMI's business and the creation of SMPI, his answers were intended to convey accurately the information he thought the insurer was seeking and that to have answered in a way that was "technically" correct (*i.e.,* that SMPI had been in operation only for 6 months) would have been misleading. (Parkinson Depo. 72-83).

Parkinson's testimony is supported by the fact that, in response to the question about whether the insured had been subject to regulatory actions (recalls, warning letters, etc.), he provided information about regulatory

actions that had occurred while the pain pumps were still being manufactured by SMI, prior to the creation of SMPI.

Thus, given the requirement under Utah law that a "misrepresentation" include some level of bad faith, the court cannot hold that these answers constitute "misrepresentations" as a matter of law.

Again, however, even if these answers gave Colony the right to rescind the Year Two policy, Colony has waived that right and/or is estopped from asserting it as a matter of law.

### D. **Waiver/Estoppel**

The undisputed record evidence supports the conclusion that, as a matter of law, Colony should be estopped from exercising any right to rescind the two policies in question and/or has waived any such right.

The information that SMPI attached to the Year Two policy alone should have put Doan on notice of questions concerning both the identity of the applicant company as well as whether it "contracted out" sales activities.

It should be recalled that the Year Two policy was a *renewal* application. (Doan Depo. 109). Doan testified that he thought that SMI had simply changed its name to SMPI, and the policy was structured the same as the Year

One policy, *i.e.*, it was excess to the same renewed underlying CNA policy.

Doan also dealt with the same broker on SMPI's behalf, who stated in the email seeking the quote: "Attached is the renewal application for the captioned. Need you to stay flat premium if possible." (Exh. H to Def. MSJ). The "captioned" was "Sorenson Medical, Inc." Of course, the applicant name listed on the Year Two application was "Sorenson Medical Products, Inc." Such a discrepancy would surely cause a prudent underwriter to undertake further inquiry.

Other information provided in the application -- the length of time in business, the company's regulatory history, etc. -- would also have put a prudent person on notice that there may be some question as to the identity of the corporate applicant.

Further, shortly before Doan quoted on the Year Two application, defendants' insurance broker emailed Colony and asked that SMPI be added as an additional "insured" under the Year One policy. (Exh. J to Def. MSJ). It is undisputed that this email was in the underwriting file. (Doan Depo. 122). Thus, even if Doan is not charged with the duty to have examined this email at the time of its receipt, the above discrepancies associated with the Year

Two application would have caused a prudent person to review the file, which would have revealed this email and triggered further questions.

Further, as to the "contracting out" misrepresentations, the Year Two application included information, discussed above, which was sufficient to put a prudent person on notice that the applicant utilized wholesale distributors to place its product with end users.

Even if all of these facts did not form a basis for estoppel, the record further demonstrates that, no later than the end of 2008, Colony was not only fully aware of the fact that defendants had, under its interpretation, "contracted out" the sale of the pain pumps, but Reitwiesner had "checked" the underwriting file and contacted coverage counsel.

Reitwiesner's memo of September 30, 2008, states explicitly that SMI sold the pain pumps to independent sales persons who, according to the pain pump plaintiffs' allegations, had allegedly improperly recommended the intra-articular use of the pumps. (Exh. Q to Def. MSJ). Doan, who underwrote the policies, was a recipient of this report.

Colony's position that this "contracting out" information is "material" is inconsistent with its position

that Reitwiesner should not be charged, at that juncture, with knowledge of the contents of the policy applications. In other words, if the fact that the insured contracted out its sales activities was so important to the insurer, then why, upon learning this information, would the insurer not immediately check to see if that information had been disclosed during the underwriting process?

This rhetorical question need not be answered, however, because the ensuing events further dispel any doubt that Colony is estopped from asserting any right of rescission.

On October 9, 2008, Reitwiesner stated that he had actually "checked" the underwriting file in search of the Year Two policy.  It is undisputed that the policy applications were in that file, but Reitwiesner, who was already calling for a coverage analysis, apparently failed to review them.

Just weeks later, Reitwiesner began providing Mary Stafford, outside coverage counsel, with relevant policy documents.  Reitwiesner testified that Stafford had full access to the underwriting file and that he was "pretty sure" she reviewed it.  Yet, when Colony issued its first reservation of rights letter on November 17, 2008, it said

nothing about alleged misrepresentations in the policy applications.

More than nine months then elapsed before August 5, 2009, when Reitwiesner sent Stafford a copy of an endorsement to the CNA policy adding several Sorenson entities as additional insureds.  Reitwiesner asked Stafford to "Take a look and let me know your thoughts." Clearly, the issue in question was the relationship between the various Sorenson entities as it related to the holders of the policies.

Nonetheless, on August 28, 2009, Colony allowed SMPI to purchase the three-year ERP for the price of $135,720, more than the premium of the Year One and Year Two policies combined.

In November 2009, the Kentucky pain pump cases were mediated, leading to the *Cornett* settlement.  In the wake of this settlement, which exhausted the underlying policy, Doan's boss began asking questions about what Colony knew when it renewed its excess policy.  This triggered Doan's email of December 11, 2009, in which he asserts that he would not have underwritten the renewal had he known what he learned in the December 9 conference call with counsel. (Exh. 29 to SOF).

When asked in his deposition what he learned in that
call that prompted him to review the policy applications,
Doan testified:

> Because I think one of the things was I found out that
> Sorenson had used Mr. Jordan to sell in this –
> distribute the products.
>
> And then one of thing (sic) that pop into my mind is,
> wow, did I really take on this risk knowing that they
> actually using outside vendors to do the distributing
> and sales and servicing their products.
>
> And that's when I started looking on the apps to see –
> look at the supplemental apps to see if that was
> really the case or was I mistaken or did I accept the
> risk knowing that they used outside vendors.

(Doan Depo. 194).

Yet this is the very same information reported in
Reitwiesner's September 30, 2008 memo, which Doan received
*over a year before the conference call*.

Given these undisputed facts, no reasonable jury could
find that Colony acted reasonably and timely in invoking
any right to rescission that it may have had in regard to
the alleged misrepresentations it now alleges.  In the
alternative, Colony waived any such right by failing, after
learning the above information, to assert that right,
instead extending the policy and collecting further
premiums.  *See Continental Ins. Co. v. Kingston*, 114 P.3d
1158, 1162 (Utah App. 2005) (noting that "insurer waives
the right to rescind an insurance policy when that insurer

has knowledge of facts that would give it the right to rescind the policy, and does not act promptly to assert or reserve the right to rescind the policy, or otherwise treats the policy as valid, such as by earning and collecting premiums." (citing *Farrington v. Granite State Fire Ins. Co.*, 232 P.2d 754, 758 (Utah 1951)).

Defendants are thus entitled to summary judgment on Counts I and II of Colony's complaint.

### E.   Coverage Defenses

#### 1.   "Claims Made and Reported" (Count IV)

##### a.   *Zink*

Colony argues that the *Zink* claim is not covered under either policy because it was made in the Year One policy period but not reported to Colony until the Year Two policy period.  In turn, defendants argue that the *Zink* claim was both "made" and "reported" during the Year Two policy period.

The Colony policies' "Claims Made and Reported Endorsement" states: "This insurance applies only if a claim is first made and reported in writing during the 'policy period' of this policy."  The policy does not define when a claim is "made."  However, the policy states that its definitions and conditions follow those of the underlying insurance, *i.e.*, the CNA policy.

The CNA policy states:

**C.   When A Claim Shall be Deemed Made**

. . .

>   b.   in the case of a civil proceeding in a court
>        of law or equity or arbitration, on the date
>        of service upon or other receipt by you of a
>        complaint against you in such proceeding or
>        arbitration.

(Exh. N to Def. MSJ at 15).

The *Zink* case was filed on May 28, 2008, during the
Year One policy period.  Although the docket does not
reflect service on defendants, in response to
interrogatories propounded by Colony in this case,
defendants state that they first received the *Zink*
complaint on or about July 15, 2008, when Zink's attorney
sent a copy to their attorney, Brian Goldwasser.  (Exh. L
to Def. MSJ).  Of course, the Year Two policy period began
July 1, 2008.  Under the above language, the claim would
thus have been "made" within the Year Two policy period.

Colony argues, however, that there is a material issue
of fact as to whether defendants were actually notified of
the *Zink* claim prior to July 1, 2008.  (Doc. 66 at 9-10).
In support, Colony cites the deposition testimony of
Gregory Thomas, Sorenson's General Counsel, which it
characterizes as a "concession" on this issue:

> Q. Do you know of any instance in which a claim was made against SMP or SMI in one policy period but it wasn't reported to Colony National until after that policy expired?
>
> A. The only one that I am aware of would be Zink, and that's been brought to my attention because of the allegations in this lawsuit.

(Doc. 66-2 at 4). The Court does not read this testimony as a "concession" but rather merely as an acknowledgment that this contention about the *Zink* claim has been raised in this litigation.

Colony also argues that a document produced by defendants' broker during this litigation demonstrates that defendants had notice of *Zink* within the Year One policy period. This document purports to be a "loss run" report from CNA which lists the *Zink* lawsuit and, on a line titled "Date Reported," states: 2008-6-06. (Doc. 66-3 at 4). The Court understands Colony's argument to be that, assuming this document shows that CNA was given notice of *Zink* on June 6, 2008, then defendants must have been notified of the claim on or before that date.

The Court cannot make this inferential leap. First, this document is unauthenticated and unexplained. While Colony states that it comes from the business records of Moreton and/or CNA, the record is not supported by an

affidavit from a person who could testify as to the document's creation, maintenance, or meaning.

"It is well-established . . . that a party cannot rely on unauthenticated documents to avoid summary judgment." *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F. Supp.2d 1258, 1263 (D. Kan. 1998) (citation omitted). "Thus, business records, which normally would be admissible at trial under the hearsay exception set forth at Fed. R. Evid. 803(6), may be considered only if authenticated by a person through whom the exhibits could be admitted into evidence." *Id.* Further, "the court is under no obligation at the summary judgment stage of proceedings to examine all the hypothetical ways in which evidence could be reduced to an admissible form by the time of trial." *Id.* at 1264.

Indeed, the Sixth Circuit has repeatedly emphasized that "unauthenticated documents do not meet the requirements" of Rule 56. *Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) (citing cases so holding).

Even were the document not hearsay, without an explanation from someone familiar with it and the information it contains, the Court cannot say that one could reasonably infer that the fact that the report states that the Zink claim was reported to CNA on June 6, 2008, demonstrates that defendants had been served with or had

otherwise "received" a copy of the *Zink* complaint, as required by the above CNA policy definition.

Therefore, this document is insufficient to raise a triable issue of fact, and the Court concludes as a matter of law that the *Zink* claim was "made" within the Year Two policy period. Because it is undisputed that defendants gave written notice of *Zink* to Colony on August 6, 2008[2], also within the Year Two policy period, defendants are entitled to summary judgment on Colony's claim that the *Zink* claim is not covered under the Year Two policy.

### b. *Cornett*

#### i. Erosion of CNA Policy

Although defendants assert that they do not seek coverage for the *Cornett* settlement under the Colony policy[3], whether that claim would be covered is nonetheless relevant because Colony asserts that non-coverage means that the expenses associated with settlement of the claim do not count towards erosion of the limits of the underlying CNA policy.

The *Cornett* claim was filed on May 30, 2008. (Case No. 2:08cv100, Doc. 1). SMI was served on June 6, 2008. (*Id.*

---

[2] The Court notes that the August 6, 2008, email states that its purpose is to give notice to both Colony *and* CNA of the *Zink* claim, which was "recently received" by Sorenson. (Exh. 14 to SOF).

[3] The *Cornett* settlement was apparently fully paid by CNA.

Doc. 3). Thus, under the above policy language, the *Cornett* claim was "made" during the Year One policy period.

The record contains no evidence that defendants gave written notice to Colony of this claim within the Year One policy period. Indeed, Colony produced evidence, which defendants have not disputed, that the first written notice defendants gave Colony of the *Cornett* claim occurred on November 21, 2008. (Doc. 75, Exh. A).

Therefore, this claim does not fall within the basic insuring agreement of the policy because it was not reported in writing during the policy period. *See Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 210 F. Supp.2d 658, 668 (E.D. Pa. 2002) ("Failure to comply with the reporting provision of a 'claims made' policy precludes coverage.").

The next question is: does the fact that the *Cornett* claim fails to satisfy the "Claim Made and Reported Endorsement" mean that the expenses associated with that claim do not erode the limits of the underlying CNA policy for purposes of determining when Colony's excess policy is triggered?

Colony relies on two provisions in the policy to argue that this question must be answered in the positive:

**Section II – Limits of Insurance**

. . .

4.

. . .

c.   Any exhaustion of any limit of any "underlying insurance" for any coverage, term or condition excluded by this policy shall not be deemed to exhaust the "underlying insurance."

. . .

6.   The Underlying Aggregate Limits where applicable shall be unimpaired at the attachment date of this coverage and for the purpose of this insurance only occurrences to which this insurance applies taking place during the term of this coverage shall be considered in determining the extent of any exhaustion of the underlying aggregate limits.

Section 4.c supports Colony's position that a claim that is outside the coverage grant of the policy may not be counted towards exhaustion of the underlying limits.  The "Claims Made and Reported Endorsement" states that the insurance applies only if a claim is first made and reported in writing during the policy period.  At the bottom of the endorsement, it states: "ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED."  The policy thus treats the requirements of this endorsement as "terms or conditions" of the policy.  A claim not made and reported in writing during the policy period is excluded under these terms.

Defendants argue that because Section 4.c does not use the term "claim" in the "coverage, term or condition"

phrase, this clause does not apply.  The Court disagrees.
It appears that this limitation was written broadly to
prohibit counting towards exhaustion *anything* which the
Colony policy does not cover, whether by reason of
exclusion, failure to satisfy terms of the coverage grant,
or otherwise.  To use the word "claim" would have unduly
narrowed the scope of this limitation because "claim" is
itself a defined term under the policy (via the definitions
incorporated by reference from the CNA policy).

Colony also argues persuasively that allowing a non-
covered claim to erode the underlying limits would
accelerate the excess carrier's obligation and effectively
make it "primary" on claims which its policy does not
otherwise cover, thereby undercutting the excess nature of
the policy.  *See Westchester Fire Ins. Co. v. Stewart &
Stevenson Serv., Inc.*, 31 S.W.3d 654, 659 (Tex. App. 2000)
("The literal meaning of the clause is that Westchester is
not required to 'drop down' and provide coverage if the
Lloyds policy is exhausted by the payment of claims that
the *Westchester* policy does not recognize as covered
losses.").

The applicability of Section 6 is less clear because
it appears to limit exhaustion to insurance for
"occurrences" which themselves occurred during the policy

period.  In the pain pump cases, this might mean that the
surgeries or resulting injuries might have to occur during
the policy period.  The parties devote little discussion to
this clause and do not expand on how it should be applied.
In any event, because Section 4.c stands alone, the court
need not reach a conclusion regarding Section 6.

Under Section 4.c, the *Cornett* claim does not count
towards exhaustion of the underlying policy limit.

### ii.  Estoppel

Finally, defendants argue that, for two reasons,
Colony is equitably estopped from asserting this coverage
defense with respect to the *Cornett* claim.  First,
defendants assert that the November 17, 2008, reservation
of rights letter was too general to put defendants on
notice of Colony's position as to this alleged coverage
"gap," and Colony did not identify any specific issues with
respect to the *Cornett* claim until its letter of April 1,
2010.

Second, defendants argue that statements by
Reitwiesner during the November 2009 mediation give rise to
equitable estoppel.

First, while the Supreme Court of Utah has held that
an insured may invoke the doctrine of equitable estoppel to
prevent an insurer from denying coverage, *see Youngblood v.*

*Auto-Owners Ins. Co.*, 158 P.3d 1088 (Utah 2007), this use of estoppel appears limited to situations where the insurer makes a false and misleading statement "*before the contract is consummated.*" *Youngblood v. Auto-Owners Ins. Co.*, 111 P.3d 829, 832 (Utah App. 2005) (emphasis added). Otherwise, as the Utah Court of Appeals noted, "the great majority of states dealing with the doctrine of estoppel have held that it cannot be used to bring risks which were not covered by the terms of the policy within coverage of the policy." *Id.* n.1 (quoting *Perkins v. Great-West Life Ass. Co.*, 814 P.2d 1125, 1131 (Utah App. 1991)).

Here, defendants do not allege any pre-contract conduct which would bring this case within that narrow exception. Moreover, even if the doctrine were applicable, defendants' position would still not prevail.

Three elements are required for such equitable estoppel:

> [A] statement, admission, act, or failure to act by
> one party inconsistent with a claim later asserted;
> next, reasonable action or inaction by the other party
> taken or not taken on the basis of the first party's
> statement, admission, act or failure to act; and,
> third, injury to the second party that would result
> from allowing the first party to contradict or
> repudiate such statement, admission, act, or failure
> to act.

*Youngblood*, 158 P.3d at 1092 (citations and internal quotations omitted).

A "party claiming an estoppel cannot rely on
representations or acts if they are contrary to his
knowledge of the truth or if he had the means by which with
reasonable diligence he could ascertain the truth." *Id.* at
1095. "Correspondingly, insurance purchasers fail to make
the effort to read and understand the content of their
insurance policies at their peril. When the language is
clear, direct, understandable to ordinary people, and
complete, it will be more difficult to prove reasonable
reliance on contrary oral promises." *Id.* at 1096.

While defendants argue that the reservation of rights
letter that Colony sent to SMI on November 17, 2008, was
ineffective to reserve the rights that it now asserts in
this action, they cite no Utah authority on point to
support this argument.

Moreover, the November 17, 2008 letter, which was the
first reservation of rights letter sent by Colony,
specifically identifies the "claims made and reported"
requirement as being at issue and states: "The Argonaut
Policies only apply to claims first made against Sorenson
and reported in writing during the policy period. To the
extent an underlying claim was not both first made and
reported during the effective dates of one of the Argonaut

Policies, then no coverage will be provided under that Policy for that claim." (Exh. R to Def. MSJ)

That Colony did not specify the claims which had not been properly reported is of no import. Defendants had given written notice to Colony of the *Zink* claim on August 6, 2008, evidencing awareness of the notice requirement. Defendants concede that they were also aware of the other claims filed against them prior to November 2008 (Doc. 67 at 38), and presumably they knew that they had not given Colony timely written notice of them.[4] No prejudice could thus have arisen from Colony's failure to list the names of these other claimants.

Further, the fact that Colony did not mention the erosion issue does not form a basis for estoppel. As the court pointed out in *Youngblood*, *supra*, an insured has a duty to read its insurance policy. Here, upon receipt of the November 2008 reservation of rights letter, defendants presumably would have reviewed their policies and, if there were questions about the limitation clause at issue, they could have sought clarification from Colony. Defendants were by that time represented by sophisticated counsel, not

---

[4] There is some suggestion, reading between the lines, that defendants were relying on their broker to provide the requisite notice to Colony. That, of course, does not relieve defendants, as the insureds, from complying with the policy's requirements.

only for purposes of defending against the pain pump claims, but also for negotiating with their insurers.

Moreover, the November 2008 letter explicitly states that "the foregoing enumeration of defenses and policy provisions is not meant to be nor is to be construed as a waiver of any term, provision, condition, definition or exclusion which may now or hereafter apply to coverage afforded under the Policies."  Defendants were thus on notice that Colony might assert defenses to coverage other than those discussed in this letter.  *See Pizzini*, 210 F. Supp.2d at 675 (rejecting insured's argument that insurer was estopped from asserting violation of "claims made and reported" requirement where reservation of rights letter was not specific; requirement goes to threshold issue of scope of coverage and not condition of forfeiture).

Finally, defendants argue that the conduct of Reitwiesner during the November 2009 mediation gives rise to estoppel.  This argument is unavailing.  Although defendants state in their briefs that Reitwiesner "assured" LeVoy Haight, Sorenson's representative, that there would be coverage under the excess policies, this sorely mischaracterizes Haight's testimony.

Haight did not even remember the name of the Colony representative, could not remember specifically what he

said, and could only testify about the "general tenor" of
the conversation. (Haight Depo. 61-62). Haight testified
that he "interpreted" the conversation to mean that the
Colony policies would provide coverage, but again he could
not testify as to anything specific that was said.

In short, Haight's testimony is far too general and
uncertain to form the basis for equitable estoppel against
Colony on the erosion issue.

### c. *Morgan, Voges, and Wera*

Defendants assert that the court should not entertain
Colony's argument that the *Morgan*, *Voges*, and *Wera* claims
are not covered under the policies in question because
Colony's complaint mentions only the *Zink* and *Cornett*
claims.

While Colony's complaint does raise coverage defenses
only to the *Zink* and *Cornett* claims, defendants'
counterclaim for bad faith alleges that *all* Kentucky pain
pump claims were properly reported to Colony, that Colony's
failure to cover the claims constitutes bad faith, and that
Colony is estopped from asserting coverage defenses to
these claims. Defendants have thus placed these three
additional claims squarely in issue, and Colony's motion
for partial summary judgment is properly directed at them.
The court will thus consider them on their merits.

Spencer Morgan was added as a plaintiff to the *Ritchie* lawsuit through an Amended Complaint filed on February 28, 2008. (Case No. 2:08cv019, Doc. 7). Although the docket does not reflect service on defendants, an answer to the Amended Complaint was filed on their behalf on March 12, 2008. (*Id.* Doc. 9). Thus, under the above policy language, the *Morgan* claim was "made" during the Year One policy period.

Cassie Voges was added as a plaintiff to the *Ritchie* lawsuit via a Second Amended Complaint filed on April 8, 2008. (*Id.* Doc. 16). Defendants answered on April 28, 2008. Thus, the *Voges* claim also was "made" during the Year One policy period.

Finally, Jeffrey Wera was a plaintiff in the *Cornett* case, which as noted was filed on May 30, 2008, and SMI was served on June 6, 2008. Thus, the *Wera* claim was also "made" during the Year One policy period.

As with *Cornett*, defendants have produced no evidence that they gave written notice to Colony of these three claims with the Year One policy period.[5] These claims this also fall outside the coverage grant of the Colony policy.

---

[5] A February 28, 2008, email from defendants' broker to CNA regarding the *Morgan* claim was contained in the email chain sent to Colony on August 8, 2008. (Exh. 14 to SOF). This, of course, could not constitute valid written notice of *Morgan* to Colony during the Year One policy period.

The above analysis regarding the erosion and estoppel issues with respect to the *Cornett* claim applies equally to these claims, and the costs associated with the claims thus do not count towards erosion of the underlying CNA policy.

## 2. Exhaustion of Underlying Limit of Year Two Policy (Count III)

Colony's final claim in Count III of its complaint involves construction of the underlying CNA policy and the issue of whether the pain pump claims filed after July 1, 2008, "relate back" so that they are deemed to arise under the Year One CNA policy. Colony asserts that, under such a construction, any claims filed in Year Two will never exhaust the underlying limits of that policy, and thus Colony's Year Two policy will never be triggered. (Compl. ¶¶ 65-72).

The problem with this claim, as defendants correctly argue, is that construction of the CNA policy is not before this court and, in fact, is the very issue currently being litigated in Utah federal court. Of course, CNA is not a party to this case.

This claim thus asks, in essence, for an advisory opinion. The court thus concludes that there is no "case or controversy" as to Count III of the complaint.

**F.**          <u>**Summary of Holdings**</u>

Given the complexity of the issues raised herein, the Court summarizes its holdings as follows:

1)     While triable issues of fact exist as to whether the answers given by SMI and SMPI on the policy applications were "misrepresentations" as that term is interpreted under Utah law**, defendants are nonetheless entitled to summary judgment on Colony's claims for rescission (Counts I and II) because Colony is estopped from asserting any right to rescind the policies and/or it waived any such right.**  By the end of 2008, Colony had information which would have put a prudent person on notice and caused an inquiry which would have revealed the actual facts underlying the alleged misrepresentations in the applications.  Yet Colony did not attempt to reserve any right to rescind based on these alleged misrepresentations until February 2010, over a year later.

(2)  The *Zink* claim was both "made" and "reported" during the Year Two policy period and is thus covered under that policy.

(3)  The *Cornett*, *Morgan*, *Voges*, and *Wera* claims are not covered under the policies because they do not satisfy the "claims made and reported" requirement.  Further, they do not count towards the erosion of the underlying policy limits, and Colony is not estopped from asserting this defense.

(4)  Count III of Colony's complaint does not present an actual "case or controversy" because CNA is not a party to this action, and the interpretation of its policy is not before this Court.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. 27) and plaintiff's motions for partial summary judgment (Docs. 28, 29) be, and are hereby, **GRANTED IN PART AND DENIED IN PART**, consistent with the above opinion.

This 21st day of December, 2011.



Signed By:
*William O. Bertelsman*
United States District Judge